# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SERGIO GROBLER, Individually and On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NEOVASC INC., ALEXEI MARKO, and CHRISTOPHER CLARK,<br><br>Defendants. | CASE NO. |

## CLASS ACTION COMPLAINT

Plaintiff Sergio Grobler ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Neovasc Inc. ("Neovasc" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Neovasc's website concerning the Company's public statements; (d) the court filings in connection with the lawsuit against Neovasc by CardiAQ Valve Technologies, Inc. ("CardiAQ"); and (e) review of other publicly available information concerning Neovasc and the Individual Defendants.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action against Neovasc and certain of its officers and/or directors for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities that purchased Neovasc securities between January 26, 2015 and May 19, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The Exchange Act claims allege that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price.  As a result of the fraud described below, the Company has lost a substantial portion of its value.

2.     Neovasc is a specialty medical device company that develops, manufactures, and markets cardiovascular products worldwide.  Neovasc was incorporated in 2000 and is headquartered in Richmond, British Columbia, Canada.  The Company's main product is the Tiara, a transcatheter mitral valve device used to treat mitral valve disease.  The Tiara, which the Company started developing in the second quarter of 2011, can be implanted through minimally invasive surgery to individuals who experience mitral regurgitation as a result of mitral heart valve disease.

3.     On June 6, 2014, CardiAQ Valve Technologies, Inc. filed suit in the United States District Court for the District of Massachusetts against Neovasc and a subsidiary asserting claims for correction of inventorship, breach of contract, breach of implied covenant of good faith and fair dealing, fraud, misappropriation of trade secrets, and unfair and deceptive trade practices.

4.     CardiAQ is a medical device company whose platform technology is a Transcatheter Mitral Valve Implantation ("TMVI") system designed to be an alternative to open-chest surgery for treating mitral regurgitation in the human heart.  CardiAQ has been developing this technology for years.  The TMVI device is intended to be delivered into a patient's heart through a "transcatheter" procedure, by which a catheter is inserted through a small incision in

the patient's leg.  The device consists of two components: (1) an expandable metal frame and (2) valve leaflets made from animal tissue that are sewn to the metal frame.

5.      By April 2009, CardiAQ began filing patent applications to protect the intellectual property it had developed, and was developing, in Massachusetts concerning certain aspects of the TMVI technology.

6.      In June 2009, CardiAQ received an unsolicited email from Brian McPherson ("McPherson"), the Vice President of Operations and President of the Surgical Products division at Neovasc, offering Neovasc's biological tissue materials and associated development and manufacturing services to CardiAQ.  The email and the Company's introduction presentation attached to it represented that Neovasc viewed its customers as industry partners. The Company also represented that Neovasc's core products were "implantable pericardial tissue technologies" and the "Reducer stent for refractory angina."

7.      Neovasc and CardiAQ executed Neovasc's Non-Disclosure Agreement ("NDA") later that month, and, in July 2009, CardiAQ signed a Purchase Order for Neovasc to perform certain services involving the assembly of heart valves in accordance with CardiAQ's TMVI technology. CardiAQ then began disclosing various aspects of its confidential and proprietary Transcatheter Aortic Valve Implantation ("TAVI") and TMVI technology to its primary points of contact at Neovasc, McPherson and Randy Lane ("Lane").  The disclosures included the inventions by Dr. Arshad Quadri (CardiAQ's founder) and Brent Ratz (CardiAQ's President and COO) described above, as well as designs, drawings, frames and specifications for successful and unsuccessful devices that CardiAQ developed through its own research.

8.      In February 2010, CardiAQ transferred its principal place of business to Irvine, California.  It notified Neovasc that soon it would no longer need an outside valve manufacturer. From July 2009 through April 2010, Neovasc assembled more than ten valves for CardiAQ

pursuant to the parties' written Purchase Order contract and under the confidentiality restrictions of the NDA.

9.      At no point during the parties' business relationship did Neovasc disclose that it intended to develop its own TMVI technology or any form of competing mitral valve product. In May 2010—a mere three months after CardiAQ notified Neovasc of its intent to terminate their business relationship—Neovasc filed its first U.S. patent application covering TMVI technology, listing only Neovasc personnel as inventors.  CardiAQ was unaware of the patent application until January 2012.  On November 12, 2013, the United States Patent and Trademark Office issued U.S. Patent No. 8,579,964 ("the '964 Patent") to Neovasc. The '964 Patent allegedly discloses various aspects of CardiAQ's TMVI technology, including the inventions by CardiAQ.

10.      CardiAQ unsuccessfully attempted to resolve the dispute without judicial intervention, prompting it to sue Neovasc in federal court in Massachusetts.  After exhaustive motions practice, the case went to trial.

11.      On May 19, 2016, a jury awarded CardiAQ $70 million in damages after determining that Neovasc had breached contractual provisions and misappropriated three trade secrets.  On this news, Neovasc's stock price declined 75%, from $1.84 per share on May 19, 2016 to $0.46 per share on May 20, 2016.

12.      Plaintiff alleges that, throughout the Class Period, Defendants issued materially false and misleading statements regarding the Company's business, operational and legal practices.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that the Company's Tiara device was developed through unlawful business practices, including the misappropriation of three trade secrets from CardiAQ; (ii) that CardiAQ's lawsuit against Neovasc indeed had merit as the Company misappropriated trade

secrets; and (iii) that, as a result of the above, Defendants' statements about Neovasc's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

13.     As a direct result of Defendants' wrongful actions, Neovasc's common stock traded at artificially inflated prices throughout the Class Period.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

15.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b 5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act.  A substantial portion of the acts in furtherance of the alleged fraud, including the effects of the fraud, have occurred in this Judicial District.

18.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

19.     Plaintiff Sergio Grobler, as set forth in the accompanying certification, incorporated by reference herein, purchased Neovasc common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20.     Defendant Neovasc Inc. is, and at all times herein mentioned was, a corporation organized and existing under the laws of Canada with its principal place of business in Richmond, British Columbia, Canada.

21.     Defendant Alexei Marko ("Marko") was, at all relevant times, the Chief Executive Officer ("CEO") and a director of Neovasc.  Marko has held management positions with Neovasc's predecessor companies since 1999 and assumed the role of CEO in conjunction with the Company's expansion and restructuring.

22.     Defendant Christopher Clark ("Clark") was, at all relevant times, the Chief Financial Officer ("CFO") of Neovasc.  Clark has been with Neovasc since 2007.

23.     Defendants Marko and Clark are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Neovasc's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background of Neovasc

24.   Neovasc is a specialty medical device company that develops, manufactures, and markets cardiovascular products worldwide.  Neovasc's main product is the Tiara, a transcatheter mitral valve device used to treat mitral valve disease.  The Tiara, which the Company started developing in the second quarter of 2011, can be implanted through minimally invasive surgery to individuals who experience mitral regurgitation as a result of mitral heart valve disease.

25.   On June 6, 2014, CardiAQ Valve Technologies, Inc. filed suit in the United States District Court for the District of Massachusetts against Neovasc and a subsidiary asserting claims for correction of inventorship, breach of contract, breach of implied covenant of good faith and fair dealing, fraud, misappropriation of trade secrets, and unfair and deceptive trade practices.

26.   The lawsuit stemmed from an unsolicited email from Brian McPherson, the Vice President of Operations and President of the Surgical Products division at Neovasc, to CardiAQ, offering Neovasc's biological tissue materials and associated development and manufacturing services to CardiAQ.  The email and the Company's introduction presentation attached to it represented that Neovasc viewed its customers as industry partners. The Company also represented that Neovasc's core products were "implantable pericardial tissue technologies" and the "Reducer stent for refractory angina."

27.   Neovasc and CardiAQ executed a NDA later that month, and, in July 2009, CardiAQ signed a Purchase Order for Neovasc to perform certain services involving the assembly of heart valves in accordance with CardiAQ's TMVI technology.  CardiAQ then began disclosing various aspects of its confidential and proprietary TAVI and TMVI technology to its primary points of contact at Neovasc, McPherson and Randy Lane.  The disclosures included the inventions by Dr. Arshad Quadri and Brent Ratz described above, as well as designs, drawings,

frames and specifications for successful and unsuccessful devices that CardiAQ developed through its own research.

28.     In February 2010, CardiAQ transferred its principal place of business to Irvine, California.  It notified Neovasc that soon it would no longer need an outside valve manufacturer. From July 2009 through April 2010, Neovasc assembled more than ten valves for CardiAQ pursuant to the parties' written Purchase Order contract and under the confidentiality restrictions of the NDA.

29.     At no point during the parties' business relationship did Neovasc disclose that it intended to develop its own TMVI technology or any form of competing mitral valve product. In May 2010, Neovasc filed its first U.S. patent application covering TMVI technology, listing only Neovasc personnel as inventors.  CardiAQ was unaware of the patent application until January 2012.  On November 12, 2013, the United States Patent and Trademark Office issued U.S. Patent No. 8,579,964 ("the '964 Patent") to Neovasc. The '964 Patent allegedly discloses various aspects of CardiAQ's TMVI technology, including the inventions by CardiAQ.

30.     CardiAQ unsuccessfully attempted to resolve the dispute without judicial intervention, prompting CardiAQ to file the initial complaint against Neovasc in the United States District Court for the District of Massachusetts on June 6, 2014.  After exhaustive motions practice, the case went to trial on May 9, 2016.

### B.      False and Misleading Statements

31.     Throughout the Class Period, Neovasc and the Individual Defendants repeatedly made false and misleading statements and omissions concerning the Company's business, operations and prospects.  These false and misleading statements created a false impression concerning Neovasc's business and operational status and future growth prospects.

32.     On January 26, 2015, the Company announced that it had commenced an underwritten public offering in the United States of 8,000,000 common shares of the Company,

consisting of 6,340,000 common shares to be offered by Neovasc and 1,660,000 common shares to be offered by certain directors, officers and employees of the Company (the "Offering"). The shares were offered pursuant to a shelf registration statement (including a prospectus) previously filed with and declared effective by the SEC on May 14, 2014 and were qualified for distribution from Canada by way of a preliminary prospectus supplement dated January 26, 2015, and a final prospectus supplement.

33. In the January 26, 2015 press release, the Company stated that it intended to use the net proceeds of the Offering to develop Tiara, stating the following in pertinent part:

> Assuming successful completion of the Offering, the Company intends to use the net proceeds of the Offering (i) to complete the TIARA-I Feasibility Study; (ii) to initiate a U.S. Investigational Device Exemption Study for Tiara; (iii) to further develop and refine Tiara; (iv) to advance the commercialization of Reducer in Europe; (v) to initiate a U.S. Investigational Device Exemption Study for Reducer; and (vi) for general corporate purposes.

34. Also on January 26, 2015, the Company filed a Prospectus Supplement to the May 13, 2014 base shelf prospectus. In the Prospectus Supplement, the Company stated the following: "A former customer has alleged that we have wrongfully used its confidential information in connection with the Tiara technology." The Prospectus Supplement further represented that the former customers' allegations were "*without merit*." The Company made substantially similar statements in its Prospectus Supplement to the May 13, 2014 base shelf prospectus filed on January 29, 2015.

35. Also on January 29, 2015, the Company increased the size of the Offering "due to market interest." The January 29, 2015 press release stated the following, in pertinent part:

> Neovasc Inc. ("Neovasc" or the "Company") (NASDAQ: NVCN) (TSX: NVC) is pleased to announce that due to market interest, it has increased the size of its previously announced underwritten public offering from 8,000,000 common shares to 10,500,000 common shares of the Company. The Company also announced that it has priced the offering at US$7.19 per common share (the "Offering Price") for aggregate gross proceeds of US$63,559,600 for the Company and US$11,935,400 for the Selling Securityholders (as defined below) before deducting underwriting discounts and commissions and estimated offering

expenses payable by the Company and the Selling Securityholders. The Company is offering 8,840,000 of the 10,500,000 common shares in the offering. The remaining 1,660,000 common shares are being offered by certain directors, officers and employees of the Company (the "Selling Securityholders").

The Company has also granted the underwriters an over-allotment option to purchase up to an additional 1,575,000 common shares from the Company at the Offering Price, exercisable for a period of 30 days following closing of the offering. Leerink Partners LLC is acting as the sole book-running manager for the offering. Canaccord Genuity Inc. and JMP Securities LLC are acting as co-lead managers for the offering. Ladenburg Thalmann & Co. Inc. is acting as co-manager for the offering.

Closing of the offering will be subject to customary closing conditions, including listing of the common shares on the TSX and NASDAQ and any required approvals of the TSX, and is expected to occur on or about February 3, 2015.

The Company anticipates using the net proceeds of the offering (i) to complete the TIARA-I Feasibility Study; (ii) to initiate a U.S. Investigational Device Exemption Study for Tiara; (iii) to further develop and refine Tiara; (iv) to advance the commercialization of Reducer in Europe; (v) to initiate a U.S. Investigational Device Exemption Study for Reducer; and (vi) for general corporate purposes.

36.     On February 3, 2015, the Company announced the closing of the Offering.  The Company stated that the Company offered 10,415,000 of the 12,075,000 common shares for aggregate gross proceeds of approximately $74,883,850.

37.     On March 30, 2015, the Company announced results for the fourth quarter and full year ended 2014.  The press release included the following, in pertinent part:

Neovasc Inc. ("Neovasc" or the "Company") (NASDAQ: NVCN) (TSX: NVC) today announced financial results for the fourth quarter and full year ended December 31, 2014.  All results are reported in Canadian dollars unless otherwise stated.

2014 Highlights

First-in-human implantation of Tiara™ transcatheter mitral valve was successfully performed at St. Paul's Hospital in Vancouver, BC.

Initiated TIARA-I, the FDA approved Early Feasibility trial that will enrol[l] approximately 30 patients at participating centers in North America and Europe.

Positive results from the 104-patient COSIRA clinical study of Neovasc Reducer™ were published in the New England Journal of Medicine. Reducer was commercially launched in Europe subsequent to year end.

Listed on the NASDAQ Capital Market and graduated to the senior exchange on the TSX.

"2014 was a pivotal year with significant progress across all key fronts for our Company," commented Neovasc CEO Alexei Marko. "Interest in Tiara has grown rapidly since its first clinical use and with the initiation of the TIARA-I trial; while the article in the New England Journal of Medicine brought greater awareness of Reducer's potential benefits for refractory angina patients to physicians. The investment community has also expressed their confidence in us with over $110 million of capital raised during the past twelve months.  Looking forward, 2015 will be another exciting year for Neovasc as we work to complete the TIARA-I trial, advance Reducer's commercial reach across Europe and prepare to start its US regulatory program."

"Today, with approximately $100 million in cash and short-term investments on hand, we are well positioned to fund the major clinical and regulatory milestones that lie ahead for both Tiara and Reducer in 2015 and we are looking forward to our first commercial activity in Europe with Reducer to augment the revenues from our tissue business," noted Chris Clark, CFO of Neovasc.

38.     Also on March 30, 2015, the Company filed its 2014 Annual Report with the SEC on Form 40-F.  In addition to discussing the CardiAQ lawsuit, Exhibit 1.1 to the 2014 Annual Report reiterated Defendants' prior representation that these allegations regarding the development of the Tiara technology were "without merit."

39.     In regards to the Tiara, the Company stated the following in Exhibit 1.2 to the 2014 Annual Report:

In the second quarter of 2011, the Company formally initiated a new project to develop the Tiara, a product for treating mitral valve disease. The Tiara is in preclinical / early clinical stage development to provide a minimally invasive transcatheter device for the millions of patients who experience mitral regurgitation as a result of mitral heart valve disease (it was estimated that in 2013 mitral regurgitation will affect approximately 5.7 million people in the United States and the European Union). Mitral regurgitation is often severe and can lead to heart failure and death. Unmet medical need in these patients is high. Currently, a significant percentage of patients with severe mitral regurgitation are not good candidates for conventional surgical repair or replacement due to frailty or comorbidities. There are approximately 2.4 million patients suffering from significant mitral regurgitation in the United States. Currently there is no transcatheter mitral valve replacement device approved for use in any market.

Initial implantations of the valve have been undertaken in humans under special compassionate use exemptions (to date, four human implants of the Tiara have been completed under such exemptions). The Company is currently undertaking additional activities to set up formal multicenter clinical trials for the Tiara

device. Additional development activities are ongoing to further refine the device and develop additional sizes

While many challenges remain prior to achieving commercial production (including, but not limited to, positive clinical trials and obtaining regulatory approval from the relevant authorities), we believe the Tiara device is being widely recognized at cardiovascular medical conferences as one of the leading devices exploring this new treatment option for patients who are unable or unsuited to receive an open heart surgical valve replacement or repair. There are several other transcatheter mitral valve replacement devices in development by third parties; some of which have been implanted in compassionate use type cases with varying results.

Neovasc believes that there are several unique attributes of the Tiara device that may provide advantages over other approaches and that it will likely be one of the first transcatheter mitral valve replacement therapies to begin a formal series of human implantations. There is no certainty that the Tiara device will successfully proceed through clinical testing and ultimately receive regulatory approval to treat these patients, nor is it possible to determine at this time if any of the other development stage devices will succeed in obtaining regulatory approval.

The Tiara valve is made up of two major components: the leaflets and skirt, which are made from the Company's Peripatch™ ("Peripatch") tissue, and the nitinol frame (to which the leaflets and skirt are attached), which is manufactured by a well-established specialty manufacturer in the medical device industry. If this supplier were unable to provide the nitinol frame in the future, it would seriously impact the further development of the Tiara device. The Tiara delivery system is manufactured in-house by the Company using components that are readily available.

Regulatory Status

The Tiara is an early-stage development product without regulatory approvals in any country. The Company intends to continue to fund development of the product as cash flow allows and anticipates applying for CE mark approval in Europe in the next two to four years. To the end of December 31, 2014, the Company has spent approximately $16 million developing the product and anticipates that it may require an additional $10-15 million to apply for CE mark. There is no assurance that European regulatory approval will be granted in the time frame anticipated by management, or granted at any time in the future. There is no expectation that this product will be revenue-generating in the near term, although management believes that the product is addressing an important unmet clinical need and that the demand for the product is high.

On October 9, 2014 Neovasc announced that it has received conditional Investigational Device Exemption ("IDE") approval from the United States Food and Drug Administration ("FDA") to initiate the United States arm of its TIARA-I Early Feasibility Trial for the Company's Tiara transcatheter mitral valve. The TIARA-I Early Feasibility Trial is a multinational, multicenter trial being

conducted to assess the safety and performance of Neovasc's Tiara mitral valve system and implantation procedure in high-risk surgical patients suffering from severe mitral regurgitation ("MR"). Severe MR is a critical condition that affects millions of patients and, if left untreated, can lead to heart failure or death. This FDA conditional approval allows clinical investigators to begin enrolling patients at participating United States medical centers once local hospital and related approvals are in place. This is an important step towards Tiara becoming one of the first transcatheter mitral valve replacement devices available for treating United States patients. The TIARA-I Early Feasibility Trial will enroll up to 30 patients globally and is being overseen by a multidisciplinary committee of internationally recognized physicians co-chaired by Dr. Martin Leon (Director, Center for Interventional Vascular Therapy Columbia University Medical Center / New York-Presbyterian Hospital) and Dr. Anson Cheung (Professor of Surgery and Director of Cardiac Transplant at St. Paul's Hospital, Vancouver Canada). With this FDA approval, TIARA-I is expected to enroll patients at three highly respected United States medical centers: Columbia University Medical Center / New York-Presbyterian Hospital (New York), Lenox Hill Hospital (New York) and Cedars-Sinai Medical Center (Los Angeles). The Company is now focusing on training participating clinical teams and obtaining institutional approvals with the goal of enrolling the first United States patients in 2015.

TIARA-I also has received ethics committee approval at Antwerp Cardiovascular Center / ZNA Middelheim in Belgium and competent authority notification in that country. First European enrollment in the trial occurred in November 2014. Applications are underway for additional centers in Europe and Canada.

40.    On May 12, 2015, the Company released its financial results for the quarter ended

March 31, 2015.  The press release included the following, in pertinent part:

Neovasc Inc. ("Neovasc" or the "Company") (NASDAQ: NVCN) (TSX: NVC) today announced financial results for the quarter ended March 31, 2015.  All results are reported in Canadian dollars unless otherwise stated.

"Our top priority in 2015 is to advance the clinical and regulatory program for Tiara.  We continue to be encouraged by results to date which support the potential for Tiara as a new therapy for treating this patient population," commented Neovasc CEO, Alexei Marko. "With patient recruitment now ongoing at centers in Europe, Canada and the United States, we are adding a number of new centers to the trial to facilitate enrolment. We are also accelerating efforts to complete development of 40mm and 45mm sizes of Tiara in order to broaden the eligible patient population from those that can be treated with the current 35mm size.  We look forward to continuing to drive this program forwards in order to help address the millions of high risk surgical patients suffering from severe mitral regurgitation."

"The almost US$75 million of capital raised in the quarter has significantly bolstered our balance sheet and will allow us to execute on our tactical plans for Tiara and Reducer," noted Christopher Clark, CFO of Neovasc. "The quarter also saw our first Reducer revenues, with an Italian distributor taking receipt of its first

order for this innovative product to treat refractory angina. While we expect Reducer sales to grow gradually in 2015, this is a very exciting milestone for us."

Operationally, the quarter saw a number of key highlights. Interest in Reducer grew as a result of a paper published in the highly respected New England Journal of Medicine that outlined the positive data from the COSIRA study. The Company subsequently launched Reducer in select European countries. As well, a US $74.9 million equity financing was completed. With respect to the Company's Early Feasibility Trial, TIARA-I, enrolment is underway, however, it has been slower than anticipated in the first quarter. The trial is designed to enroll up to 30 patients, and in an effort to accelerate enrolment the Company is taking the necessary steps to increase the number of participating centers, adding two more in each of Canada, United States and Europe. Also, in order to address a larger patient pool, activities are ongoing to develop additional sizes over the current 35mm valve. Neovasc is targeting to have these additional sizes (40mm and 45mm) into first clinical use before year-end.

41.    On August 6, 2015, the Company released financial results for the second quarter

of 2015. The press release included the following, in pertinent part:

Neovasc Inc. ("Neovasc" or the "Company") (NASDAQ: NVCN) (TSX: NVC) today announced financial results for the quarter ended June 30, 2015.

"With steady activity in our tissue business, Reducer's European launch going well, and with additional successful Tiara implantations, the second quarter was constructive across all facets of our company," commented Neovasc CEO, Alexei Marko. "We are taking steps to accelerate patient recruitment in the TIARA-I study and during the quarter we made crucial adjustments towards this objective. Specifically, we have made revisions to the trial protocol to enhance enrollment and have increased the number of participating sites. We are now expecting to have eight centres recruiting patients by the end of Q3. More importantly, we are adding a second valve size to the TIARA-I study, a 40mm Tiara to complement our existing 35mm device, significantly increasing the population of eligible patients. We anticipate first use of the 40mm size in Q4 of this year. Development of the 45mm Tiara is also well underway to provide further treatment options to patients. To date, the 35mm Tiara is performing very well, meeting our expectations and clearly demonstrating its potential to greatly improve the quality of life for patients suffering from severe mitral regurgitation through a minimally invasive, catheter-based valve replacement procedure."

"Our balance sheet remains very strong, with nearly $100 million in current assets at the end of the quarter," said Christopher Clark, CFO of Neovasc. "We anticipate these funds to be more than sufficient to complete our ongoing clinical trials for Tiara and other regulatory initiatives we have for Reducer, as well as to support Reducer's European launch. Of note, Reducer sales from our controlled and limited release in Europe, although modest, have been going very well, with excellent feedback from both physicians and our distributors."

**Tiara Update**

Tiara has been implanted in eight patients to date with encouraging results. In seven of eight cases, Tiara was successfully implanted as intended, resulting in a stable and well-anchored prosthetic valve with complete resolution of the patient's Mitral Regurgitation (MR). In one case the Tiara valve was malpositioned and required conversion to surgical valve replacement. No significant transvalvular gradients, no left ventricular outflow tract (LVOT) obstruction, no paravalvular leaks or negative interactions with surrounding structures, including the aortic valve, have been observed. Implantation of Tiara has been successfully undertaken in patients suffering from both degenerative MR and functional MR and in multiple patients with pre-existing prosthetic aortic valves. Patients are continuing to thrive with significantly improved quality of life, with one patient nearing their 18-month post implant follow-up.

To date no mechanical failures of Tiara, including frame fractures or thrombus formation have been observed in clinical use, nor has any other issue been identified requiring significant modification of the current design beyond expansion of the available size matrix.

All clinical use to date has been undertaken using the 35mm Tiara. Neovasc anticipates the first clinical use of the 40mm Tiara in Q4 and the 45mm Tiara in early 2016.

A more detailed update of clinical results to date will be provided at the 27th Annual Transcatheter Cardiovascular Therapeutics (TCT) scientific symposium, the world's largest educational meeting specializing in interventional cardiovascular medicine, being held October 11-15 in San Francisco, CA.

42.    On November 9, 2015, the Company released financial results for the third

quarter of 2015.  The Company's press release stated the following, in pertinent part:

Neovasc Inc. ("Neovasc" or the "Company") (NASDAQ: NVCN) (TSX: NVC) today announced financial results for the quarter ended September 30, 2015.

"Of critical importance during the quarter we continued to advance our Tiara transcatheter mitral valve program, making adjustments to our clinical program to increase enrolment and completing development of the 40mm size," commented Neovasc CEO, Alexei Marko. "Development of the 45mm size is underway in addition to other improvements that will broaden the applicable patient population. Neovasc's Tiara technology remains at the forefront of products under development for transcatheter mitral valve replacement.  We are advancing the Tiara program in a careful and controlled manner in order to most effectively bring Tiara to market to meet this pressing need."

"For the second quarter in a row, Reducer's sales in Europe have met our expectations and in particular, the reorder rate from our early adopters is an encouraging sign for this device's longer-term acceptance into standard medical

practice," said Chris Clark, CFO of Neovasc.   "Reducer's performance is important to our business plan, as we continue to transition our focus from our legacy tissue business lines to our internally developed medical device products. Our cash position remains very strong with ample funds to support our clinical and regulatory programs for Tiara and Reducer in the near term."

Tiara Update
To date, eleven patients have been implanted with Tiara in early feasibility and compassionate use cases and early results have been encouraging. Eight of the eleven cases have proceeded substantially as intended resulting in stable implants, good prosthetic valve function, and no valvular leaks. In two of the eleven cases Tiara was malpositioned during implant, which required conversion to surgery, with one Tiara being explanted, the other repositioned and fully functional. In the remaining case, the patient developed a ventricular septal defect caused by the Tiara device, which the Company believes should be avoided in the future through modifications it has made to the screening process.  To date, the 30-day survival rate for the first eleven patients implanted with Tiara is 73% with one patient now over 600 days post implant.  Tiara devices have been successfully implanted in both functional and degenerative MR patients, as well as patients with pre-existing prosthetic aortic valves and mitral surgical rings, using both 35mm and 40mm Tiara devices.   Additional details of implantation results will be presented at appropriate medical conferences as they become available.

The results from these early feasibility and compassionate use cases have been instrumental in helping to demonstrate the potential of the Tiara as well as refining the implantation procedure, patient selection criteria and the device itself. The Company is continuing to expand its clinical program and the 45mm Tiara is in development.

43.     On March 29, 2016, the Company announced results for the fourth quarter 2015

and fiscal year 2015.  Neovasc's press release stated the following, in pertinent part:

Neovasc Inc. ("Neovasc" or the "Company") (NASDAQ: NVCN) (TSX: NVC) today announced financial results for the year ended December 31, 2015.  Of note, the Company's financial results are now being presented in U.S. dollars.

"Our chief priority for 2016 is to complete all the necessary regulatory and clinical activity to begin a CE Mark trial for Tiara, while continuing to expand Reducer's commercial footprint in Europe," commented Neovasc CEO, Alexei Marko.

"2016 will be our first full year of commercial sales for Reducer, and with distributors now in multiple European countries including Italy and Germany, we expect this base of business to grow," said Chris Clark, CFO of Neovasc.  "As we continue transitioning revenue from our legacy businesses to our own proprietary products, our balance sheet remains very strong, entering 2016 with more than $55 million in cash."

Subsequent to year end, the Company received FDA approval to include the 40 mm Tiara™ valve in the TIARA-I Early Feasibility Trial, and now has four U.S. hospitals approved to begin screening patients for this sized device. The Company believes the 40 mm valve and other initiatives will result in steady patient enrolment in the trial and related early feasibility clinical activities. Management will update the trial's progress and provide a broader clinical update for both its Tiara and the Neovasc Reducer™ at upcoming medical conferences.

44.     On March 29, 2016, the Company held a conference call to discuss Neovasc's fourth quarter and fiscal year 2015 financial results. During the conference call, the following exchange regarding the CardiAQ lawsuit occurred:

Jason Mills

Great. And then last question, just about the lawsuit, the case coming up to trial here in May. Walk us through some of that possible scenario now versus that you've gone through. I know you feel very confident about your position but could you walk us through some of the scenarios or possible scenarios that you've gone through in your analysis and just sort of give us a way of land on various scenarios once we get to that point in time?

Alexei Marko

Yes, I obviously, Jason I'd love to but unfortunately I can't comment really beyond what we've always said publicly which is that we believe *these claims are baseless*. And I think as Chris said, we will vigorously defend our IP. So, our position is that *these lawsuits really have no merit whatsoever*. So that's really the scenario that we stick behind. So I really can't say anything beyond that or walk you through any alternative scenarios.

45.     Also on March 29, 2016, the Company filed its 2015 Annual Report with the SEC on Form 40-F. In addition to discussing the CardiAQ lawsuit, Exhibit 1.1 to the 2015 Annual Report reiterated Defendants' prior representation that these allegations regarding the development of the Tiara technology were "without merit."

46.     In regards to the Tiara, the Company stated the following in Exhibit 1.2 to the 2015 Annual Report:

In the second quarter of 2011, the Company formally initiated a new project to develop the Tiara, a product for treating mitral valve disease. The Tiara is in preclinical / early clinical stage development to provide a minimally invasive transcatheter device for the millions of patients who experience mitral regurgitation as a result of mitral heart valve disease (in 2014 it was estimated that mitral regurgitation affects approximately 4.1 million people in the United States

and the European Union). Mitral regurgitation is often severe and can lead to heart failure and death. Unmet medical need in these patients is high. Currently, a significant percentage of patients with severe mitral regurgitation are not good candidates for conventional surgical repair or replacement due to frailty or comorbidities. There are approximately 1.7 million patients suffering from significant mitral regurgitation in the United States. Currently there is no transcatheter mitral valve replacement device approved for use in any market.

Clinical experience to date has been primarily with the 35mm Tiara valve and the 32 French delivery system. First clinical use of the 40mm Tiara occurred in the fourth quarter of 2015 and first use of the 45mm Tiara is targeted for 2016. The additional sizes will allow Neovasc to expand treatment to a broader population of patients.

To date, twelve patients have been implanted with Tiara in early feasibility and compassionate use cases and Neovasc believes that early results have been encouraging. The 30-day survival rate for the first twelve patients implanted with Tiara is 73% with one patient now over two years post implant. The Tiara has been successfully implanted in both functional and degenerative mitral regurgitation patients, as well as patients with pre-existing prosthetic aortic valves and mitral surgical rings.

The results from these early feasibility and compassionate use cases have been instrumental in helping to demonstrate the potential of the Tiara as well as refining the implantation procedure, patient selection criteria and the device itself. Careful patient selection continues to be critical as the Company and clinical community continue to learn more about treating this population of very sick patients.

While many challenges remain prior to achieving commercial production (including, but not limited to, positive clinical trial and study results and obtaining regulatory approval from the relevant authorities), the Company believes the Tiara is being widely recognized as one of the leading devices exploring this new treatment option for patients who are unable or unsuited to receive an open heart surgical valve replacement or repair. There are several other transcatheter mitral valve replacement devices in development by third parties; some of which have been implanted in early feasibility type studies with varying results.

Neovasc believes that there are several unique attributes of the Tiara that may provide advantages over other approaches to mitral valve replacement. There is no certainty that the Tiara will successfully proceed through clinical testing and ultimately receive regulatory approval to treat these patients, nor is it possible to determine at this time if any of the other development stage devices will succeed in obtaining regulatory approval.

The Tiara valve is made up of two major components: the leaflets and skirt, which are made from the Company's Peripatch tissue, and the nitinol frame (to which the leaflets and skirt are attached), which is manufactured by a well-established specialty manufacturer in the medical device industry. If this supplier were unable to provide the nitinol frame in the future, it would seriously impact the further

development of the Tiara. The Tiara delivery system is manufactured in-house by the Company using components that are readily available.

Regulatory Status

The Tiara is an early-stage development product without regulatory approvals in any country. The Company intends to continue to fund development of the product as cash flow allows and anticipates applying for CE Mark approval in Europe in the next two to three years. As at December 31, 2015, the Company has spent approximately $25.5 million developing the product and anticipates that it may require an additional $25-30 million as it moves forward to achieve CE Mark. There is no assurance that European regulatory approval will be granted in the time frame anticipated by management, or granted at any time in the future. There is no expectation that this product will be revenue-generating in the near term, although management believes that the product is addressing an important unmet clinical need and that the demand for the product is high.

On October 9, 2014 Neovasc announced that it has received conditional investigational device exemption approval from the U.S. FDA to initiate the U.S. arm of its TIARA-I study for the Company's Tiara. The TIARA-I study is a multinational, multicenter early feasibility study being conducted to assess the safety and performance of Neovasc's Tiara mitral valve system and implantation procedure in high-risk surgical patients suffering from severe mitral regurgitation. Severe mitral regurgitation is a critical condition that affects millions of patients and, if left untreated, can lead to heart failure or death. This FDA conditional approval allows clinical investigators to begin enrolling patients at participating U.S. medical centers once local hospital and related approvals are in place. This is an important step towards Tiara becoming one of the first transcatheter mitral valve replacement devices available for treating U.S. patients. The TIARA-I study will enroll up to 30 patients globally and is being overseen by a multidisciplinary committee of internationally recognized physicians. Tiara has also been implanted under compassionate use approvals in Canada and implantations under similar approvals are anticipated in other countries in the future.

47.    On April 29, 2016, the Company reported its first quarter results for 2016.  The

Company's press release included the following, in pertinent part:

Neovasc Inc. ("Neovasc" or the "Company") (NASDAQ: NVCN) (TSX: NVC) today announced financial results for the quarter ended March 31, 2015 (sic) (all figures in US dollars unless otherwise indicated).

"We continue to see momentum building in our Tiara program with fifteen patients treated to date and additional patients expected over the coming weeks. In addition, and subsequent to the quarter end, Health Canada approved the use of our 40 mm Tiara valve in the TIARA-I Early Feasibility Trial," commented Neovasc CEO, Alexei Marko. "Along with centers in the U.S. and Europe, three Canadian hospitals are now approved to treat patients with this sized device. With

a number of recent clinical cases performed, this approval and other measures are contributing to trial enrolment."

"Reducer sales in Europe continue to grow quarter over quarter reflecting the positive impact of our grass roots awareness campaign within the European interventional cardiologist community," said Chris Clark, CFO of Neovasc. "Reorders from existing users and distributors are driving the majority of this growth, and serves as a benchmark of physician satisfaction with the device to alleviate angina discomfort in these refractory patients who suffer persistent angina pain."

Subsequent to the quarter end the Company initiated REDUCER-I (An Observational Study of the Neovasc Reducer™ System), a post market, multi-center, multi-country three-arm, five-year follow-up study. Its primary endpoint is the percentage of subjects who experience improvement in their angina symptoms defined as a reduction in CCS grade at 6 months as compared to baseline. The study is intended to provide further clinical evidence supporting the use of the Reducer in this patient population.

## C.    **The Truth Comes to Light**

48.     On May 19, 2016, Neovasc announced the jury verdict in the CardiAQ case. The

press release stated the following:

Neovasc Inc. ("Neovasc" or the "Company") (NASDAQ: NVCN) (TSX: NVC) today announced that following a trial in Boston, Massachusetts a jury found in favor of CardiAQ, on CardiAQ's claims for relief for breach of contract, breach of the duty of honesty in contractual performance, and three of CardiAQ's six asserted trade secrets. The jury also issued advisory findings in favor of CardiAQ regarding its causes of action under Massachusetts Gen. Law. Ch. 93A and patent inventorship. The jury awarded US $70 million on the trade secret claim for relief, and no damages on the contractual claims for relief.

"Regrettably, the jury trial phase of this lawsuit was not resolved to our satisfaction. We will be exploring our options regarding post-trial motions in the trial court and, potentially, the appellate process," said Alexei Marko, CEO of Neovasc. "As we have throughout this process, we will remain diligent in our company's purpose to advance our cardiovascular products to improve patient care by addressing two significant unmet structural heart diseases, mitral regurgitation and refractory angina."

CardiAQ filed suit against Neovasc in the United States District Court for the District of Massachusetts and asserted these claims for relief regarding Neovasc's transcatheter mitral valve technology, including the Tiara.

49.     A May 19, 2016 *Law 360* article entitled "Neovasc Hit With $70M Verdict in IP,

Trade Secrets Trial," stated the following, in pertinent part:

A Massachusetts federal jury on Thursday slammed Neovasc Inc. with $70 million in damages in a medical device patent lawsuit, finding the Canadian biotech firm stole trade secrets from rival CardiAQ Valve Technologies Inc. when the companies did business together six years ago.

Jurors in Boston deliberated for just one day before returning a verdict in favor of CardiAQ against its former service provider. In addition to awarding $70 million, the jury found in favor of CardioAQ's claims for relief for breach of contract, breach of the duty of honesty in contractual performance, and misappropriation of three of the company's six asserted trade secrets.

CardiAQ co-founder J. Brent Ratz said in a written statement that the company worked for years to develop and create the CardiAQ transcatheter mitral valve, which provides patients with an alternative to open heart surgery and other therapies.

"We are proud of this foundational work and grateful that the jury recognized these contributions to the developing field of transcatheter mitral valve replacement," Ratz said.

CardiAQ, which was acquired by Edwards Lifesciences last year, alleged that Neovasc was hired by the company in 2009 to provide tissue processing and valve assembly services for its transcatherter mitral valve replacement program and the companies entered into a nondisclosure agreement. But Neovasc began secretly working on a competing project and produced its own transcatheter system. After discovering a Neovasc patent publication in late 2011, CardiAQ initiated its litigation.

Additional factual determinations found by the jury on Thursday include that Neovasc engaged in unfair or deceptive practices and that there was clear and convincing evidence that CardiAQ's founders, Ratz and Arshad Quadri, contributed to the conception of Neovasc's U.S. Patent No. 8,579,964.

50.     After the Company's announcement, Neovasc's stock price plunged 75%, from $1.84 per share on May 19, 2016 to $0.46 per share on May 20, 2016.

51.     A Business Vancouver article described Neovasc's plummet, stating that "[o]ne of the stars of Vancouver's life sciences firmament began a meteoric fall Friday, when a U.S. court awarded a US $70 million judgment against Neovasc."

52.     Reaction from the investment community was negative.  On May 20, 2016, the Company was downgraded by Ladenburg Thalmann from buy to neutral.

53.     As a result of Defendants' materially false and misleading statements and omissions during the Class Period, Plaintiff and the Class have suffered millions of dollars in damages.

54.     Neovasc's statements and filings during the Class Period were materially false and misleading, and omitted material adverse information concerning the Company's business, operations and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (i) that the Company's Tiara device was developed through unlawful business practices, including the misappropriation of three trade secrets from CardiAQ; (ii) that CardiAQ's lawsuit against Neovasc indeed had merit as the Company misappropriated trade secrets; and (iii) that, as a result of the above, Defendants' statements about Neovasc's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

## V.     UNDISCLOSED ADVERSE INFORMATION

55.     The market for Neovasc's securities was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described herein, Neovasc's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Neovasc's securities relying upon the integrity of the market price of Neovasc's securities and market information related to Neovasc and have been damaged thereby.

56.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Neovasc's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, and financial operations, as alleged herein.

57.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Neovasc's financial condition and accounting.

58.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Neovasc and its financial condition, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. Defendants' false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VI.     SCIENTER ALLEGATIONS

59.     As alleged herein, the Individual Defendants acted with scienter in that Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

60.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Neovasc, their control over, receipt and/or modification of Neovasc's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Neovasc, participated in the fraudulent scheme alleged herein.

61.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## VII.   STATUTORY SAFE HARBOR

62.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

63.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Neovasc who knew that the statement was false when made.

## VIII.   LOSS CAUSATION

64.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Neovasc's securities and operated as a fraud or deceit on Class Period purchasers of Neovasc's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Neovasc's securities

fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Neovasc's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

65. By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Neovasc's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Neovasc to conceal the truth.

66. Defendants' false and misleading statements had the intended effect and caused Neovasc's common stock to trade at artificially inflated levels throughout the Class Period. The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

67. The decline in the price of Neovasc's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Neovasc's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Neovasc's securities and the subsequent decline in the value of Neovasc's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

68. At all relevant times, the market for Neovasc stock was an efficient market for the following reasons, among others:

        a.      Neovasc securities met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient market;

        b.      As a regulated issuer, Neovasc filed periodic public reports with the SEC and NASDAQ;

        c.      Neovasc securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

        d.      Neovasc regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

69.     As a result, the market for Neovasc securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Neovasc's stock price.  Under these circumstances, all purchasers of Neovasc common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

70.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Neovasc's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.    CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Neovasc securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Neovasc and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

72.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, Neovasc securities were actively traded on NASDAQ (an open and efficient market) under the symbol "NVCN."  As of April 29, 2016, the Company had approximately 66.8 million shares outstanding.   Record owners and other members of the Class may be identified from records maintained by Neovasc and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

73.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.      whether Defendants participated in and pursued the common course of conduct complained of herein;

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Neovasc;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Neovasc;

e.      whether the market price of Neovasc common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

76.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

28

## XI.    COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT I
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
Thereunder Against Defendants**

77.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against Defendants.

78.    During the Class Period, Neovasc and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Neovasc common stock; and (iii) cause Plaintiff and other members of the Class to purchase Neovasc stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

79.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Neovasc securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Neovasc, as alleged herein.

80.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et

seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

81.     Neovasc and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Neovasc as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Neovasc's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Neovasc and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Neovasc's securities during the Class Period.

82.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and

were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

83.    These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Neovasc's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

84.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Neovasc securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Neovasc shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Neovasc securities during the Class Period at artificially inflated high prices and were damaged thereby.

85.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Neovasc, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Neovasc securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

86.     By virtue of the foregoing, Neovasc and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### COUNT II
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

88.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

89.     The Individual Defendants were and acted as controlling persons of Neovasc within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press

releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

91.     As set forth above, Neovasc and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)     Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)     Awarding such other relief as this Court deems appropriate.

## XIII.   JURY DEMAND

Plaintiff demands a trial by jury.


Dated:  June 6, 2016                              By: */s/ Joseph E. White, III*

                                                  **SAXENA WHITE P.A.**
                                                  Joseph E. White III (BBO# 648498)
                                                  225 Franklin Street,
                                                  26th Floor
                                                  Boston, MA 02110

                                                  **SAXENA WHITE P.A.**
                                                  Lester R. Hooker
                                                  5200 Town Center Circle
                                                  Suite 601
                                                  Boca Raton, FL 33486
                                                  Telephone: (561) 394-3399
                                                  Facsimile:  (561) 394-3382

                                                  *Attorneys for Plaintiff*